**SCHLEIER LAW OFFICES, P.C.**
3101 N. Central Avenue, Suite 1090
Phoenix, Arizona 85012
Telephone: (602) 277-0157
Facsimile: (602) 230-9250
TOD F. SCHLEIER, ESQ.  #004612
Email: tod@schleierlaw.com
BRADLEY H. SCHLEIER, ESQ.  #011696
Email: brad@schleierlaw.com

**CORREIA & PUTH, PLLC**
1775 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 602-6500
Facsimile: (202) 602-6501
LINDA M. CORREIA, DC Bar #435027
ANDREW M. ADELMAN, DC Bar #1029165
Email: lcorreia@correiaputh.com; aadelman@correiaputh.com
*Pro Hac Vice Pending*

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Lori Josey, a single woman, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Impulse Dynamics (USA), Inc. a Delaware corporation; and Insperity PEO Services, L.P., a Delaware corporation; | |
| Defendants. | |

**COMPLAINT**

**Retaliation in Violation of the False Claims Act**

COMES NOW Plaintiff Lori Josey, by and through her attorneys, Schleier Law Offices, PC and Correia & Puth, PLLC, and for her Complaint states to this Honorable Court as follows:

1. Ms. Josey voiced concerns to Impulse Dynamics (USA), Inc. that another Impulse employee recorded data in a clinical trial for an investigative medical device (the Optimizer) in violation of the trial's protocols, which were approved by the United States Food and Drug Administration (FDA). Ms. Josey's report was troubling to Impulse because such conduct violated FDA regulations and could lead Impulse to report unreliable or manipulated data to the FDA in support of its request for FDA approval. Upon information and belief, Impulse never reported this concern to the FDA. After reporting these concerns to Defendants Impulse and Insperity PEO Services, L.P., Impulse subjected Ms. Josey's performance and conduct to higher scrutiny and criticism. Impulse was so focused on FDA approval that nothing – let alone Ms. Josey's concerns about Impulse misleading the FDA – would stand in its way. On December 9, 2016, Defendants terminated Ms. Josey's employment because she raised these concerns in violation of the False Claims Act.

**PARTIES**

2. Plaintiff Lori Josey is an adult female resident of Georgia.

3. Defendant Impulse Dynamics (USA), Inc. ("Impulse") is a company focused on the development of a medical device for treatment of chronic heart failure (CHF).

Impulse is registered as a Delaware corporation with its corporate headquarters in New York and New Jersey. In 2016, Impulse sponsored clinical trials in Arizona.

4. Defendant Insperity PEO Services, L.P. ("Insperity") is a human resources company that is registered as a Delaware corporation, has corporate headquarters in Texas, and transacts business through offices in Arizona.

5. Defendants Impulse and Insperity jointly employed Plaintiff Josey.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically the False Claims Act, 31 U.S.C. § 3730(h).

7. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in Arizona and Defendant Insperity is located and transacts business through offices in Arizona at 4900 N. Scottsdale Road, Suite 1200, Scottsdale, AZ 85251.

## FACTS GIVING RISE TO RELIEF

### Impulse and its Optimizer System

8. Impulse is conducting clinical tests to gain approval from the FDA for an investigational medical device, known as the Optimizer. The Optimizer treats CHF through a therapy known as Cardiac Contractility Modulation. Impulse received certification in Europe for the Optimizer and is in its final stages to support FDA approval for it in the United States.

9. Impulse began clinical testing of the Optimizer in the United States in 2005 with the FIX-HF-5 study. This study did not reach its primary efficacy endpoint, and Impulse designed and implemented a new study to prospectively confirm its results: the FIX-HF-5C study.

10. Impulse is the sponsor of the FIX-HF-5C study.

11. Federal regulation defines a "sponsor" as the entity that "initiates, but who does not actually conduct, the [clinical] investigation." 21 C.F.R. § 812.3(n).

12. As the sponsor of the FIX-HF-5C study, Impulse initiated, but does not conduct, the clinical investigation and/or research to determine the safety or effectiveness of its Optimizer device.

13. Impulse submitted protocols to the FDA for approval that would govern the FIX-HF-5C clinical trial (the "Impulse Protocols"). The FDA approved the Impulse Protocols. Impulse affirmed that the FIX-HF-5C trial would be conducted in compliance with the Impulse Protocols.

14. Pursuant to regulation and the Impulse Protocols, Impulse employees were not permitted to directly recruit or provide testing to subjects in the clinical trial.

15. As one of its metrics, the FIX-HF-5C study evaluated subjects' changes in quality of life. To assess this parameter, the study used the Minnesota Living with Heart Failure Questionnaire (MLWHFQ), an industry standard questionnaire that tests the ways a heart failure treatment affects quality of life.

16. The Impulse Protocols included the MLWHFQ.

17. Impulse either has submitted or will submit to the FDA the results of the FIX-HF-5C trials as part of its attempt to obtain FDA approval of the Optimizer. The FIX-HF-5C results will include data on the MLWHFQ metric. The FDA will use this data, along with other data, to determine whether to approve the device for sale and use in the United States.

18. FDA approval will make the Optimizer eligible for federal funding and reimbursement, such as through Medicaid, Medicare, and direct payment programs. These programs look to FDA-approval as the determination of the "safety and effectiveness" of the Optimizer.

19. After receiving FDA approval, Impulse will market and sell the Optimizer throughout the United States to medical providers of patients with CHF, many of whom will obtain the Optimizer through federally funded or reimbursed programs.

**Ms. Josey's Employment with Impulse**

20. Ms. Josey began working for Defendants on January 1, 2016 as a Senior Field Clinical Engineer.

21. Ms. Josey was one of four field clinical personnel, initially supervised by Gerry Portzline, Impulse Director of Field Clinical Engineering. One of the roles of the field clinical personnel was to remove barriers that impeded site enrollments for the FIX HF-5C trial. Impulse tasked them with visiting clinical sites to advocate for recruitment of potential subjects and help increase randomization of subjects for trial participation with or without an implanted Optimizer device.

22. At the time it hired Ms. Josey, Impulse needed to complete 140 randomizations by December 2016 for the FIX-HF-5C study.

23. Ms. Josey trained site investigators and coordinators on the study protocol, provided case support for site surgeons and staff during implants, and followed up with subjects.

24. In May 2016, Impulse restructured Anthony Caforio to Director of Field Clinical Engineering and Ms. Josey's supervisor.

25. By August 2016, Ms. Josey was progressing at work, learning the Optimizer, and getting a handle on the sites and subjects with which she worked.  Several colleagues commended Ms. Josey for her good performance.

**Ms. Josey Takes Efforts to Stop Violations of the False Claims Act**

26. On August 9, 2016, while at a clinical site in Mesa, Arizona – the Chan Heart Rhythm Institute (CHRI) – Ms. Josey observed her colleague, field clinical engineer Jason Kindler, verbally administer the MLWHFQ to a subject and write the subject's responses on the questionnaire.

27. According to FDA regulations, the Impulse Protocols, and the MLWHFQ requirements, the MLWHFQ required that a clinical site coordinator – a CHRI staff member (e.g. not an Impulse employee) – administer the test to the subject, with the subject writing his or her answers on the questionnaire.  No CHRI staff member was present during Mr. Kindler's testing of this subject.

28. The manner in which Mr. Kindler administered the MLWHFQ meant that the trial sponsor (Impulse) recorded the results – making the responses (and thus the results of

the clinical trial) at best unreliable and at worst skewed (or manipulated) to the benefit of Impulse.  Because the MLWHFQ is one of the metrics for the trial's success, better MLWHFQ results translate into better clinical trial results.  These better results benefit Impulse because over-exaggerating the effectiveness of the Optimizer to the FDA makes it more likely that the FDA would approve the device.

29. Mr. Caforio walked into the room and also observed Mr. Kindler administer the MLWHFQ.  Minutes later, Ms. Josey told Mr. Caforio that the manner in which Mr. Kindler administered the MLWHFQ "was not right" because it violated the Impulse Protocols.  After finishing with the subject, and in the presence of Mr. Caforio and Ms. Josey, Mr. Kindler remarked, "You do what you have to do to get patients randomized."  Mr. Caforio did not respond to Ms. Josey's concern or Mr. Kindler's comment.

30. Later, after the death of a CHRI subject, Ms. Josey learned that CHRI site coordinator Wendy Schwoegler complained to Impulse Clinical Manager Angela Stagg that Mr. Kindler pressured her to rush subjects through the testing to get subjects randomized as quickly as possible.

31. Ms. Josey reasonably believed the conduct of Mr. Kindler and Mr. Caforio meant the clinical trial results that Impulse would report to the FDA would be unreliable, skewed, or manipulated to the benefit of Impulse.

32. Ms. Josey reasonably believed that, without intervention, Impulse would submit to the FDA unreliable, skewed, or manipulated data regarding the Optimizer that over-exaggerated its effectiveness.

33. Ms. Josey reasonably believed that, without intervention, the FDA would approve the Optimizer based on misrepresentations and/or omissions made by Impulse.

**Impulse Retaliates Against Ms. Josey**

34. After Ms. Josey raised her concerns to Mr. Caforio, Impulse subjected Ms. Josey to heightened scrutiny and criticism for conduct that she routinely performed beforehand, none of which was performance-related.

35. Impulse did not subject other employees who engaged in the same conduct to similar scrutiny or criticism.

36. For example, in late August and September, Mr. Caforio ramped up scrutiny of Ms. Josey's expense reports and questioned her charges to a higher degree than prior to August 9, 2016. Impulse did not scrutinize the expense reports for any other field clinical personnel in the same or similar way.

37. Beginning in September 2016, Mr. Caforio questioned Ms. Josey's practice of purchasing one-way flights, the practice of all Impulse field clinical team personnel and a practice previously approved by Impulse management, including Mr. Caforio. Impulse did not scrutinize the flight purchases of other field clinical personnel.

38. Throughout September 2016, Ms. Josey reached out to Mr. Caforio multiple times – by telephone, text message, and email – in an attempt to reset their working relationship. Mr. Caforio never took Ms. Josey up on her offer.

39. On September 21, 2016, Mr. Caforio informed Ms. Josey that any communication she had with anyone at Impulse "gets back to" him.

40. On September 28, 2016, Ms. Josey received an email from Mr. Caforio placing her on a 30-day disciplinary notice period, warning her that if she did not demonstrate immediate improvement, she would be subject to further disciplinary action or termination. The 30-day warning cited Ms. Josey for insubordination based on voicing her concerns that he subjected her to heightened scrutiny, particularly related to her expense reports. Additionally, it cited Ms. Josey for refusing to split with Mr. Kindler a $1,500 dinner bill for clients on September 17, 2016, and for alleged unprofessional comments and behavior during the dinner.

41. The warning did not contain any performance-related issues or misconduct.

42. Ms. Josey responded to Mr. Caforio's email outlining his heightened scrutiny of her behavior beginning August 11, 2016 and explaining his false account of her conduct during the September 17 dinner. Ms. Josey included on this email Mr. Caforio's supervisor, Impulse Vice President of Clinical Operations Norbert Clemens, as well as Impulse Chief Executive Officer Simos Kedikoglou and Impulse Vice President of Human Resources Nitsan Mor.

43. Later on September 28, 2016, Mr. Caforio sent an email to Ms. Josey requesting that she provide him with meticulous details of her two upcoming clinical site visits. Prior to this request, Ms. Josey, like all field personnel, provided management with a weekly report of her site activity. Impulse did not request this information of any other field clinical personnel. Weeks later when Mr. Caforio requested the remainder of the field team to detail their activity on the group calendar, only Ms. Josey and Jason Kindler of the four field employees complied.

44. After September 28, 2016 and prior to the termination of her employment, Defendants did not issue any performance or conduct-related counseling or discipline to Ms. Josey.

45. On September 29, 2016, Ms. Josey spoke to Ms. Mor on the telephone. During the conversation, Ms. Josey reported to Ms. Mor that Mr. Kindler and Mr. Caforio failed to follow the Impulse Protocols at CHRI. Ms. Josey further told Ms. Mor that after she reported this conduct, Mr. Caforio subjected her to hostile and retaliatory treatment. They also discussed Ms. Josey's response to the 30-day warning. Ms. Josey requested that Ms. Mor contact the attendees of the September 17 dinner to confirm that Ms. Josey engaged in no inappropriate or unprofessional conduct.

46. On October 4, 2016, Mr. Clemens called Ms. Josey to discuss the conduct she witnessed and opposed regarding the administration of the MLWHFQ in Arizona. In that conversation, Ms. Josey informed Mr. Clemens that the allegations in Mr. Caforio's 30-day warning were false, and she asked him to verify that the alleged conduct during the September 17 dinner as described by Mr. Caforio never took place.

47. Mr. Clemens told Ms. Josey they would discuss Mr. Caforio and Mr. Kindler's conduct in Arizona during an in-person meeting with Ms. Josey and Mr. Caforio to take place in Arizona.

48. On October 12, 2016, Ms. Josey sent an email to Mr. Clemens, Ms. Mor, and Mr. Kedikoglou and described in detail the conduct by Mr. Kindler and Mr. Caforio in Arizona that she believed violated the Impulse Protocols and put into question the legitimacy of the MLWHFQ data. She also shared additional concerns about Mr. Kindler's

conduct that questioned the validity of all data collected from CHRI.  Ms. Josey wrote that she witnessed Mr. Kindler put pressure on the CHRI site coordinator to rush subjects through the testing process and to overlook Impulse Protocols and that Mr. Kindler performed testing to get subjects randomized in an effort to meet the 140-subject target.  By cutting corners and failing to abide by the Impulse Protocols, Mr. Kindler was putting into question the legitimacy of the randomized subjects at CHRI and the data of the clinical study.  Ms. Josey requested that Mr. Clemens, Ms. Mor, and Mr. Kedikoglou reach out to the CHRI site coordinator to verify her concerns.

49. Ms. Josey concluded in her email that Mr. Caforio was retaliating against her and treating her in a hostile manner since August 2016 because she voiced concerns about his and Mr. Kindler's conduct.

50. Ms. Josey reported her concerns about this data because she believed Impulse would submit it to the FDA for approval of the Optimizer when it was unreliable, skewed, or manipulated.

51. On October 19, 2016, Mr. Clements responded to Ms. Josey's email and informed her that Impulse intended to handle her concerns "with the seriousness and care expected from a professional company like" Impulse.

52. On November 9, 2016, Ms. Josey spoke with Defendant Insperity's Human Resource Specialist Erin Lau on the telephone.  Ms. Josey told Ms. Lau about the conduct she witnessed on August 9, 2016 by Mr. Kindler, her complaint to Mr. Caforio about Mr. Kindler, her concerns regarding the impact of Mr. Kindler's conduct, and Mr. Caforio's heightened scrutiny and criticism of her since that time.

53. Thereafter, Ms. Josey copied Ms. Lau on several emails she sent to Impulse's management concerning Mr. Caforio's retaliatory behavior.

54. On November 10, 2016, Ms. Josey met with Mr. Clemens and an outside auditor, hired and paid for by Impulse, in Mesa, Arizona. Mr. Clemens began the less than 10 minute conversation by asking why Ms. Josey "made up" her concerns about Mr. Kindler and Mr. Caforio. Ms. Josey responded by reiterating the conduct she observed.

55. Mr. Clemens informed Ms. Josey that the auditor was present to review the paperwork at the clinical site for completion, from consent forms to data collection, to make sure that CHRI completed all the required paperwork for the trial in the event of an unplanned FDA audit.

56. Also during the November 10, 2016 conversation, Mr. Clemens confirmed based on his investigation that Mr. Caforio's allegations about Ms. Josey's behavior during the September 17 dinner were false and that she engaged in no unprofessional or inappropriate behavior.

57. Without more, however, Defendant's paper audit would not have uncovered Mr. Kindler's conduct. Mr. Kindler did not sign the MLWHFQ form or write on it in a way that would allow the auditor to identify that he – rather than the subject or site coordinator – completed it.

58. To Ms. Josey's knowledge, neither the auditor nor any of Defendants' employees spoke to any subject or CHRI staff regarding Mr. Kindler's violations of the Impulse Protocols. Additionally, Ms. Josey was never questioned, interviewed, or included in any audit or investigation by Defendants into her allegations.

59. Upon information and belief, Impulse never reported Ms. Josey's concerns, the audit, the improper conduct, or the breaches of the Impulse Protocols to the FDA.

60. After the November 10, 2016 meeting, Ms. Josey did not hear from anyone regarding the results of the audit or any investigation of her reported concerns.

61. Within hours of meeting with Mr. Clemens, Ms. Josey sent a follow-up email to Mr. Clemens, Ms. Mor, and Mr. Kedikoglou memorializing their discussion.

62. On November 30, 2016, Ms. Josey sent an email to Mr. Clemens, Ms. Mor, and Mr. Kedikoglou requesting a conference call to discuss "everything that has happened since August and plans moving forward."

63. On December 9, 2016, Mr. Caforio and Ms. Mor called Ms. Josey on the telephone and informed her that Defendants were terminating her employment, in part, for reporting false accusations about the conduct of Mr. Caforio and Mr. Kindler in Mesa, Arizona.

64. In their December 12, 2016 termination letter, Defendants reiterated that one of the reasons they were terminating Ms. Josey's employment was "[f]alse reporting of serious accusations" regarding Mr. Caforio and Mr. Kindler's conduct in Mesa, Arizona.

65. Defendant Insperity's Human Resources Specialist Ms. Lau signed the December 12, 2016 termination letter.

**Retaliation in Violation of the False Claims Act**

66. Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-65 of this Complaint with the same force and vigor as if set out here in full.

67. Plaintiff engaged in activity protected under the statute by reporting a concern about an Impulse employee's conduct which reasonably could lead to a viable False Claims Act action.

68. Plaintiff engaged in activity protected under the statute by voicing concerns to Defendants that the actions of Impulse's agents violated FDA regulations and the Impulse Protocols.

69. Plaintiff engaged in activity protected under the statute by voicing concerns to Defendants that Impulse's agents engaged in conduct that would lead it to misrepresent or omit data that Impulse would submit to the FDA for approval of its medical device.

70. Plaintiff in good faith believed that the actions of Defendant's agents violated the Impulse Protocols and FDA regulations.

71. Plaintiff in good faith believed that the actions of Defendant's agents meant Impulse would misrepresent or omit data about the Optimizer to the FDA.

72. Plaintiff in good faith believed that the FDA would approve the Optimizer based on misrepresentations or omissions by Impulse.

73. A reasonable employee in the same or similar circumstances might believe that Impulse would misrepresent or omit data to the FDA for approval of the Optimizer and that the FDA would approve the Optimizer based on that data.

74. Defendants knew that Plaintiff engaged in the protected activity.

75. Defendants knew that Plaintiff's concerns implicated misrepresentations and/or omissions Impulse would make on the government.

76. Defendants discriminated against Plaintiff Josey because she engaged in protected activity under the False Claims Act when they subjected her to heightened scrutiny and criticism.

77. Defendants discriminated against Plaintiff Josey because she engaged in protected activity under the False Claims Act when they terminated her employment.

78. As a direct and proximate cause of the discrimination to which she was subjected, Ms. Josey suffered and continues to suffer lost wages and benefits, loss of health due to stress, humiliation, indignity, and emotional distress.

## PRAYER FOR RELIEF

**WHEREFORE**, the premises considered, Ms. Josey respectfully prays that this Honorable Court:

1. Enter judgment on her behalf against all Defendants on the claim contained herein;

2. Award Ms. Josey reinstatement with the same seniority status that she would have had but for the discrimination, two times the amount of back pay, and front pay;

3. Award Ms. Josey compensatory and other damages;

4. Award Ms. Josey her court costs, expenses, attorneys' fees, prejudgment interest, and post-judgment interest;

6. Declare that Defendants' conduct is in violation of 31 U.S.C. § 3730(h); and

7. Grant such other and further relief as this Court deems just and proper.

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff Lori Josey, by and through counsel, and pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands a jury trial.

DATED this 22nd day of February 2018.

SCHLEIER LAW OFFICES, P.C.

/s/ Tod F. Schleier
Tod F. Schleier

CORREIA & PUTH, PLLC

/s/ Linda M. Correia
Linda M. Correia
Andrew M. Adelman
Attorneys for Plaintiff

**CERTIFICATE OF MAILING**

I hereby certify that on this 22nd day of February 2018, I electronically filed the foregoing document with the U.S. District Court Clerk using the CM/ECF system.

/s/ Cindy J. Anderson